

**NUMBER 13-19-00251-CR**

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI – EDINBURG

THE STATE OF TEXAS,                                                            Appellant,

v.

LETICIA VALDEZ,                                                                Appellee.

**On appeal from the County Court at Law No. 4
of Hidalgo County, Texas.**

# MEMORANDUM OPINION

**Before Chief Justice Contreras and Justices Longoria and Perkes
Memorandum Opinion by Chief Justice Contreras**

Appellee Leticia Valdez was charged by sworn complaint with driving while intoxicated (DWI), a Class B misdemeanor. *See* TEX. PENAL CODE ANN. § 49.04. She moved to suppress evidence on grounds that the arresting officer lacked reasonable suspicion to stop her vehicle and lacked probable cause to arrest. The trial court granted

the motion. The State argues by two issues on appeal that: (1) the trial court's findings of fact are "largely unsupported" by the record, and (2) the trial court erred in granting the motion to suppress. We affirm in part and reverse and remand in part.

## I. BACKGROUND

Trooper Joseph Macias of the Texas Department of Public Safety (DPS) was the only witness at the suppression hearing on April 17, 2019. Macias stated that, at around 10:30 p.m. on July 17, 2018, he was patrolling alone on westbound Interstate 2 in Mission when he observed appellee's black SUV "make an unsafe lane change" in front of him and onto an exit ramp. Macias activated his emergency lights and appellee pulled into the parking lot of a hotel. After reviewing an incident report, Macias testified that he approached the car on the driver's side to identify himself. He testified that he "could smell the alcoholic beverage emitting from the cabin of her vehicle" and that appellee "had bloodshot eyes as well." Appellee denied that she had anything to drink.

Macias testified that he had a "passive alcohol sensor flashlight" which takes air from inside the cabin of the vehicle and alerts "if there's alcohol present in the vehicle." He testified that he used the sensor "[r]ight up on the window" of appellee's vehicle and "[i]t went straight to red, meaning that there was alcohol present in the cabin of the vehicle." Based on the odor and the sensor reading, Macias asked appellee to step out of the car so he could perform Standardized Field Sobriety Tests (SFSTs). According to Macias, appellee exhibited Horizontal Gaze Nystagmus (HGN), or "involuntary jerking of the eyes," indicating she was "more than likely . . . heavily intoxicated." Macias stated that he allowed appellee to return to her car to "take her heels off," but when she got there, "[s]he attempted to use her phone to call a trooper that she knows to have him try to talk

2

[Macias] out of it." Appellee then refused to take any further SFSTs, and she refused a portable breath test. When asked to perform a one-legged stand and a walk-and-turn, appellee told Macias "she could not imagine a straight white line" because she got up at "6:00 a.m." and "had been up for 24 hours."[1] Macias then arrested appellee for DWI based on "her appearance, the breath, the way she was acting and that's it."

On cross-examination, Macias agreed that appellee used her turn signal to make the lane change, and he could not remember what lane she originated in. He reiterated that he had to brake when she made the lane change, and he stated: "If I have to brake in order for her to get in front of me, it's an unsafe lane change because I have to avoid an accident." Macias agreed that his report did not mention that he had to brake when appellee came into his lane, nor did it mention that appellee used her turn signal. He acknowledged that he did not have an independent recollection of what happened that night, but instead, he was relying on the incident report for his testimony. He later said: "I could just remember that she just did the HGN, she took her shoes off, and she didn't want to do anything else, and that she smelled like alcohol and she looked disheveled."

Macias could not recall whether appellee told him she could not perform the HGN test because she had astigmatism, but he conceded that appellees' driver's license states that she uses corrective lenses. He said appellee was not wearing glasses that night. Macias further agreed that, according to his training, even if appellee had not been drinking alcohol, "someone with [a]stigmatism is always going to test positive" on the HGN test.

---

[1] As the officer noted at the scene and as the State repeatedly notes on appeal, if appellee indeed woke up at 6:00 a.m. that morning, then she had been actually awake for only around sixteen hours at the time of the traffic stop.

3

After the hearing, upon being advised by the prosecutor that a video recording of the traffic stop had been made, the trial court stated: "[The] Court will also consider the video, along with today's evidence, and will take the matter under advisement." It granted appellee's motion to suppress by order dated May 9, 2019, and the State filed this appeal. *See* TEX. CODE CRIM. PROC. ANN. art. 44.01(a)(5) (permitting the State to appeal an order granting a motion to suppress evidence in a criminal case). Pursuant to this Court's request, the trial court entered findings of fact and conclusions of law, including the following:

1. On July 17, 2018, Trooper Joseph Macias stopped [appellee] around 10:46 p.m. for making an unsafe lane change.

2. Trooper Macias relied on Tex. Trans. Code. Sec. 545.060(a)(2) when thought [sic] he had at least reasonable suspicion to stop [appellee], because he had to brake his vehicle when [appellee] moved her vehicle in front of his in the far-right lane.

3. The video shows, and this Court finds that the distance between [appellee] and Trooper Macias remained the same when she took the Bryan Road exit, indicating that Trooper Macias did not brake in order to avoid [appellee] when she took that exit.

4. [Appellee] safely moved her motor vehicle from her initial traffic lane into the far-right traffic lane to exit onto the frontage road at the Bryan Road exit.

5. [Appellee] posed no danger to Trooper Macias or to any other driver when she took the Bryan Road exit.

6. [Appellee] did utilize her blinker to cross over one lane in order to exit from off the east bound U.S. Interstate 2 freeway onto the frontage road at the exit for Bryan Road.

7. Trooper Macias' testimony that he had to brake in order to avoid [appellee] when she made the Bryan Road Exit is not credible.

8. This Court takes judicial notice of the videos that do not show that Trooper Macias braked in order to avoid an accident when [appellee] was leaving the interstate freeway to take the Bryan Road exit.

9. Throughout his testimony, Trooper Macias did not independently remember what happened at the scene.

4

10. Much doubt as to his credibility is cast upon Trooper Macias' testimony because of his failure to independently remember the details of the evening leading up to and culminating in [appellee]'s detention and subsequent arrest.

11. After looking at his report, Trooper Macias testified that he remembered that he smelled alcohol coming from the cabin of the vehicle.

12. The video recordings show, and the Court so finds that Trooper Macias approached and arrived next to the driver's window on [appellee]'s vehicle and commented that he smelled alcohol coming from the vehicle.

13. Those recorded oral statements by Trooper Macias that he smelled alcohol are not credible.

14. Its repetitions or references at any point during the hearing and in all other videos are not credible.

15. Each audible oral statements [sic] of [appellee] on the videos are credible.

. . . .

20. Tex. Evid. Rule 104(a) requires that the trial court determine the admissibility of expert testimony by the clear and convincing standard. *See Kelly v. State*, 824 S.W.2d 568, 572 n.10 (Tex. Crim. App. 1992).

. . . .

22. The State did not request that this court take judicial knowledge of any articles, studies or papers regarding the reliability or relevancy of results of the passive alcohol sensor testing described by Trooper Macias.

23. Currently, the passive alcohol sensor lacks the support necessary for the court to take judicial notice of the verifiable certainty of this novel scientific procedure.

24. Even if this court could take judicial notice of the passive alcohol sensor, the State has failed to satisfy the *Kelly* prongs by tendering evidence or information to convince the court by clear and convincing evidence that [(a)] the underlying scientific theory of the passive alcohol sensor was valid; (b) the technique applying the theory was valid; and (c) Trooper Macias properly applied the technique on the occasion in question.

. . . .

27. No evidence was admitted by the State to establish the reliability of the passive alcohol sensor utilized and described by Trooper Macias.

5

28. This Court finds neither reliable nor relevant Trooper Macias' testimony that the passive alcohol sensor flashlight detected the presence of alcohol on [appellee] or her vehicle. To that same testimony, the court gives no weight since it is inadmissible.

29. This Court takes judicial notice of the 2015 [National Highway Traffic Safety Administration (NHTSA)] DWI Detection and Standardized Field Sobriety Testing (SFST) Participant Manual found at https://www.nhtsa.gov/sites/nhtsa.dot.gov/files/documents/ sfst_pm_full_manual.pdf.

30. This Court judicially notices that the underlying research that demonstrates that the HGN technique can be a valid test for the presence of alcohol in the suspect's body is premised on the obligation of Trooper Macias to continuously hold the stimulus (his finger) during the HGN test approximately 12-15 inches in front of suspect [appellee]'s nose and slightly above her eye level at each continuous position point for at least four (4) seconds. *See* [2015 DWI Detection and SFST Participant Manual]; *Emerson v. State*, 880 S.W.2d 759, 766–67 (Tex. Crim. App. 1994).

. . . .

34. The videos conclusively show, and this Court finds that Trooper Macias did not properly apply the HGN tests since his stimulus was held much closer to [appellee's] nose than approximately 12–15 inches during the test.

35. The videos conclusively show, and this Court finds that Trooper Macias did not properly apply the HGN tests since the stimulus (his finger) was not always held at a continuous position point for at least four (4) seconds.

36. Trooper Macias' deviations from the required standard were much more than slight, making any results unreliable, irrelevant and also inadmissible under Tex. Evid. Rules 402 and 702.

37. The State failed to carry its burden by clear and convincing evidence that Trooper Macias properly applied the required HGN testing standard techniques on the occasion in question.

38. [Appellee] has a restriction on her license which pertains to the need to wear corrective lenses.

39. Trooper Macias did not ask [appellee] if she was wearing contacts, corrective lenses, or had had corrective laser surgery on her eyes prior to conducting the HGN test on her.

40. Trooper Macias did not inquire if [appellee] had astigmatism or any other eye condition prior to conducting the HGN test.

6

41. The videos conclusively show, and this Court finds that [appellee] was credible when she stated that she had been working all day long, had been up since 6:00 a.m., and had gone to bed the night before at around 1:00 a.m.

42. The videos conclusively show, and this Court finds that [appellee] was credible when she stated that she was exhausted after Trooper Macias detained her and before he arrested her.

43. The videos conclusively show, and this Court finds that [appellee] did not appear disheveled at any point during the stop.

44. The videos conclusively show, and this Court finds that [appellee] did not slur her speech and she spoke as a sober person.

45. The videos conclusively show, and this Court finds that [appellee] did not trip or stumble and moved and acted as a very cautious sober person.

. . . .

47. The videos conclusively show, and this Court finds that [appellee] demonstrated signs of sobriety throughout her encounter with Trooper Macias.

. . . .

51. [Appellee] could not leave and was effectively under arrest when Trooper approached her and began asking her questions.

52. Trooper Macias did not read [appellee] her *Miranda* warnings either prior to or after arresting her.

53. Trooper Macias did not read [appellee] her Article 38.22 warnings either prior to or after arresting her.

54. The Court takes judicial notice of Tex. Trans. Code §§ 724.013, 724.015, and 724.048, as well as subchapters C and D.

55. The State failed to demonstrate that any evidence of "refusal to provide a specimen of breath or blood" is relevant, reliable, and admissible.

56. [Appellee] did refuse to submit to the taking of a breath specimen.

57. [Appellee]'s refusal to submit to the taking of a breath specimen followed her arrest for an offense prohibiting the operation of a motor vehicle, while intoxicated.

58. [Appellee]'s refusal to provide that specimen did not occur after any

7

officer had informed her both orally and in writing all the information required by Tex. Trans. Code Sec. 724.015.

In summary, the trial court concluded that (1) appellee did not make an unsafe lane change, (2) Macias did not have reasonable suspicion to stop appellee's vehicle, and (3) Macias did not have probable cause to arrest. The court's conclusions of law specified that the following are inadmissible: (1) "all of [appellee]'s pre-arrest verbal statements"; (2) "all of [appellee]'s post-arrest verbal statements"; (3) the HGN test results; (4) the "readings from the passive alcohol sensor"; and (4) appellee's "refusal to provide specimen evidence."

## II. DISCUSSION

### A. Standard of Review

In reviewing a trial court's ruling on a motion to suppress, we apply a bifurcated standard of review, giving "almost total deference" to a trial court's determination of historical facts and mixed questions of law and fact that rely upon the credibility of a witness, but applying a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations. *Martinez v. State*, 348 S.W.3d 919, 922 (Tex. Crim. App. 2011). When a trial judge makes written findings of fact, as here, we examine the record in the light most favorable to the ruling and uphold those fact findings so long as they are supported by the record. *Baird v. State*, 398 S.W.3d 220, 226 (Tex. Crim. App. 2013). We then proceed to a de novo determination of the legal significance of the facts as found by the trial court. *Id.* We will uphold the trial court's ruling if it is supported by the record and correct under any theory of law applicable to the case. *Young v. State*, 283 S.W.3d 854, 873 (Tex. Crim. App. 2009).

**B. Applicable Law**

Under the Fourth Amendment, a brief investigative detention such as a traffic stop is authorized only if an officer has "reasonable suspicion" to believe that an individual is involved in criminal activity. *Carmouche v. State*, 10 S.W.3d 323, 329 (Tex. Crim. App. 2000). "A police officer has reasonable suspicion to detain if he has specific, articulable facts that, combined with rational inferences from those facts, would lead him reasonably to conclude that the person detained is, has been, or soon will be engaged in criminal activity." *Matthews v. State*, 431 S.W.3d 596, 603 (Tex. Crim. App. 2014). "In determining whether an officer has reasonable suspicion to detain, we look at the totality of the circumstances through an objective lens, disregarding the officer's subjective intent." *Id.* "Although some circumstances may seem innocent in isolation, they will support an investigatory detention if their combination leads to a reasonable conclusion that criminal activity is afoot." *Id.* "[T]he relevant inquiry is not whether particular conduct is innocent or criminal, but the degree of suspicion that attaches to particular non-criminal acts." *Derichsweiler v. State*, 348 S.W.3d 906, 914 (Tex. Crim. App. 2011)).

A warrantless arrest is constitutional only when there is "probable cause" for the arresting officer to believe that a criminal offense has been or is being committed. *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004); *Baldwin v. State*, 278 S.W.3d 367, 371 (Tex. Crim. App. 2009); *see* U.S. Const. amend. IV; Tex. Const. art. I, § 9; *Torres v. State*, 182 S.W.3d 899, 901 (Tex. Crim. App. 2005) (citing *Minnesota v. Dickerson*, 508 U.S. 366, 372 (1993)). Probable cause exists if, at the time the arrest is made, the facts and circumstances within the arresting officer's knowledge, or of which the officer has reasonably trustworthy information, are sufficient to warrant a prudent person to believe

that the arrested person had committed or was committing an offense. *Amador v. State*, 275 S.W.3d 872, 878 (Tex. Crim. App. 2009) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *Torres*, 182 S.W.3d at 901. The test for probable cause is an objective one, unrelated to the subjective beliefs of the arresting officer, and it requires a consideration of the totality of the circumstances facing the arresting officer. *Amador*, 275 S.W.3d at 878; *State v. Steelman*, 93 S.W.3d 102, 107 (Tex. Crim. App. 2002). A finding of probable cause requires more than bare suspicion but less than would justify conviction. *Amador*, 275 S.W.3d at 878 (citing *Brinegar v. United States*, 338 U.S. 160, 175 (1949)).

"An operator on a roadway divided into two or more clearly marked lanes for traffic . . . may not move from the lane unless that movement can be made safely." TEX. TRANSP. CODE ANN. § 545.060(a)(2).

A person commits DWI if the person is intoxicated while operating a motor vehicle in a public place. TEX. PENAL CODE ANN. § 49.04(a). "Intoxicated" means: (A) not having the normal use of mental or physical faculties by reason of the introduction of alcohol, a controlled substance, a drug, a dangerous drug, a combination of two or more of those substances, or any other substance into the body; or (B) having an alcohol concentration of 0.08 or more. *Id.* § 49.01(2).

### C. Video Evidence

The State principally argues on appeal that the video recordings in the record constitute "indisputable evidence" that "directly contradicts the findings and conclusions made by the trial court." *See Miller v. State*, 393 S.W.3d 255, 263 (Tex. Crim. App. 2012) ("[W]hen evidence is conclusive, such as a written and signed agreed stipulation of evidence or 'indisputable visual evidence,' then any trial court findings inconsistent with

10

that conclusive evidence may be disregarded as unsupported by the record, even when that record is viewed in a light most favorable to the trial court's ruling." (citing *Tucker v. State*, 369 S.W.3d 179, 187 (Tex. Crim. App. 2012) (Alcala, J., concurring))); *see also Carmouche*, 10 S.W.3d at 332 ("[T]he nature of the evidence presented in the videotape does not pivot 'on an evaluation of credibility and demeanor.' Rather, the videotape presents indisputable visual evidence contradicting essential portions of [the officer's] testimony.").

A trial court's findings of historical fact based on a videotape recording are still reviewed under a "deferential standard." *Carter v. State*, 309 S.W.3d 31, 40 (Tex. Crim. App. 2010); *Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006). We must defer to those findings unless the video recording "indisputably contradicts" them. *State v. Houghton*, 384 S.W.3d 441, 446 (Tex. App.—Fort Worth 2012, no pet.).

The video evidence submitted to the trial court consists of four recordings of the traffic stop: two which appear to be from the dashcam of Macias's patrol unit; one which appears to show the passenger's seat of Macias's patrol unit; and one which appears to be from a bodycam Macias was wearing. Macias gave no testimony about the creation or preservation of the recordings at the suppression hearing, and the existence of video evidence was not mentioned at all until the conclusion of the hearing. Nevertheless, it is apparent that the trial court's findings and conclusions were based in large part on its independent review of the recordings, and they have been included in a supplemental reporter's record on appeal.

The first two videos show that Macias was driving in the right lane of the expressway when appellee passed him in the center lane, activated her right turn signal,

11

and moved into the right lane around one or two car lengths in front of Macias. With the turn signal still activated, appellee applied her brakes and moved right into the exit lane, pulling in behind another vehicle which was already exiting. In moving to the exit lane, appellee drove over two solid white lines separating the right lane from the exit lane. At that point, Macias followed appellee into the exit lane, activated his emergency lights and siren, and initiated the traffic stop.

The dashcam and bodycam recordings show that, after pulling appellee over, Macias approached appellee's car on the driver's side, pointed a flashlight in the open window, advised appellee that she was being pulled over for an unsafe lane change, and asked appellee for her license and insurance. Macias then asked appellee how much she had to drink that night, and appellee denying drinking anything. Macias then said: "Are you sure? My flashlight is saying that there's alcohol air in your car." Appellee agreed to step out of the car so the officer could administer the HGN test. Macias asked several more times whether appellee had been drinking, and appellee continued to deny it. He then administered the HGN test, which lasted approximately two minutes. The video recordings do not affirmatively show whether appellee displayed indicia of intoxication during the HGN test.

Macias then asked appellee to "picture an imaginary line" so that she could perform a walk-and-turn. Appellee stated that she could not do so because she was "really tired" and "in high heels." Macias allowed appellee to return to her car to take off her shoes. When appellee got into the car, she began to use her cell phone. Macias asked her to put the phone down so she could resume the tests. Appellee asked Macias if she could call her attorney, and she twice asked Macias if he knew Rudy Trevino, another DPS Trooper.

12

After a few seconds, appellee complied with Macias's instructions and exited the car. She again advised Macias that she did not want to perform the walk-and-turn because she was "really tired" and "very exhausted." Again, she denied that she had been drinking. Macias told appellee that he thought she had been drinking because of her eyes and because she was "swaying" while she took the HGN test. When appellee refused to take a portable breath test, Macias arrested her for DWI.

According to the video evidence, at one point during the traffic stop, appellee told Macias that she had someone who could pick her up and take her home; this prompted Macias to ask why she would need someone to take her home if she was not drunk. Appellee responded that she was very tired.

Also according to the video evidence, after being arrested and placed in the passenger seat of Macias's patrol unit, appellee talked to Trevino on the phone and asked him to talk to Macias on her behalf.

**D. Reasonable Suspicion**

We first examine whether there was reasonable suspicion for the initial traffic stop. The trial court found from the dashcam videos that the distance between Macias's and appellee's car "remained the same" as she changed lanes, and it inferred from this observation that Macias "did not brake in order to avoid" appellee. The videos do not definitively show whether Macias actually applied his brakes when appellee changed lanes in front of him and then into the exit lane. The trial court is correct that the distance between the two cars does not appear to change appreciably after appellee moved into the right lane. However, the video clearly shows that *appellee* applied her brakes immediately upon entering the right lane in front of Macias. Thus, it is not rational to infer,

13

from the mere fact that the distance between the cars remained the same, that Macias did not need to brake. Instead, since appellee applied her brakes directly in front of Macias, and the distance between the two cars remained roughly the same, it is rational to infer that Macias must have either applied his brakes or released his accelerator because of appellee's maneuver.[2]

In any event, for the traffic stop to be justified, the record needs to show only that Macias had specific, articulable facts indicating that appellee made an unsafe lane change. *See Matthews*, 431 S.W.3d at 603. As noted, the video conclusively establishes that appellee cut in front of Macias, slowed down, crossed the double white line to get into the exit lane, and pulled into the exit lane closely behind the other car which was already exiting. The trial court could have disbelieved Macias and disregarded all of his testimony at the suppression hearing, including his testimony that he had to brake to avoid appellee. However, the court was not at liberty to disregard the clear video evidence that appellee made an unsafe lane change in violation of the transportation code. *See* TEX. TRANSP. CODE ANN. § 545.060(a)(2). We conclude that Macias had reasonable suspicion for the traffic stop. The trial court's conclusion to the contrary is indisputably contradicted by the video evidence.

## F. Probable Cause

Having determined that the initial traffic stop was justified by reasonable suspicion,

---

[2] As the State notes, the Fort Worth Court of Appeals has held that "deceleration, whether by braking or discontinuing acceleration, in response to a weaving driver, is evasive, and unsafe weaving does not require that other drivers brake or make quick, furtive movements." *Dunn v. State*, 478 S.W.3d 736, 742 n.2 (Tex. App.—Fort Worth 2015, pet. ref'd) (citing *Taylor v. State*, 916 S.W.2d 680, 681–82 (Tex. App.—Waco 1996, pet. ref'd) (considering swerving into another lane and almost hitting an officer's vehicle to be unsafe driving); *Yeakley v. State*, No. 03-09-00584-CR, 2011 WL 677391, at *4 (Tex. App.—Austin Feb. 25, 2011, pet. dism'd) (mem. op., not designated for publication) (holding that surrounding drivers' use of caution to avoid the appellant's weaving vehicle did not render the weaving safe)).

we must next consider whether the DWI arrest was supported by probable cause. As noted, Macias was the only witness to testify at the suppression hearing, and the trial court made clear in its findings that it did not find Macias credible. The State contends that the video evidence "indisputably contradicts" several of the trial court's findings and its conclusion that there was no probable cause to arrest. The State also argues that the trial court improperly suppressed evidence regarding the passive alcohol sensor and the HGN test on grounds which were not argued in appellee's motion to suppress or at the hearing.

Macias testified at the suppression hearing that there was an odor of alcohol coming from inside appellee's car. The video shows that Macias repeatedly advised appellee at the scene that he smelled alcohol. However, the trial court disbelieved Macias's testimony regarding the presence of an alcohol odor, as was its prerogative. *See Martinez*, 348 S.W.3d at 922. And importantly, the video evidence does not "indisputably contradict" the trial court's finding that Macias was not being truthful because video, by its very nature, cannot confirm or refute the existence of an odor. Similarly, though Macias testified that appellee's eyes were bloodshot, the trial court was entitled to disbelieve that testimony, and the video does not indisputably show that the testimony was true.

Macias also testified that a "passive alcohol sensor" in his flashlight detected the presence of alcohol inside the cabin of appellee's vehicle. The trial court suppressed all of Macias's testimony about the flashlight sensor principally on grounds that it was unreliable under *Kelly v. State*. *See Kelly*, 824 S.W.2d at 573 ("[B]efore novel scientific evidence may be admitted under Rule 702, the proponent must persuade the trial court,

by clear and convincing evidence, that the evidence is reliable and therefore relevant. . . . [E]vidence derived from a scientific theory, to be considered reliable, must satisfy three criteria in any particular case: (a) the underlying scientific theory must be valid; (b) the technique applying the theory must be valid; and (c) the technique must have been properly applied on the occasion in question."); *see also* TEX. R. EVID. 702 (governing expert testimony). The State correctly notes that appellee did not argue in her motion to dismiss or at the suppression hearing that the flashlight alcohol sensor was unreliable or inadmissible under *Kelly*. Moreover, the State correctly observes that the rules of evidence generally do not apply in pre-trial suppression hearings. *See* TEX. R. EVID. 101(e) ("These rules—except for those on privilege—do not apply to . . . the court's determination, under Rule 104(a), on a preliminary question of fact governing admissibility."); TEX. R. EVID. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so deciding, the court is not bound by evidence rules, except those on privilege."); *Granados v. State*, 85 S.W.3d 217, 227 (Tex. Crim. App. 2002).

Nevertheless, assuming but not deciding that readings from a "passive alcohol sensor" would generally be admissible in a suppression hearing, the trial court was within its discretion to disbelieve Macias's testimony that the sensor "went straight to red" in this case. The only evidence that Macias's flashlight contained a sensor and the sensor detected alcohol was the officer's suppression hearing testimony. The videos do not demonstrate that the flashlight detected alcohol in appellee's car or even that it was capable of doing so—rather, it appears as an ordinary black flashlight. The video recordings do not "indisputably contradict" the trial court's findings that Macias's testimony

16

about the "passive alcohol sensor" readings was untruthful. Accordingly, we may not disturb those findings.

Additionally, the trial court excluded evidence of the HGN test on grounds that it was not administered properly as required by the NHTSA manual referenced in the order. The bodycam video recording does not indisputably contradict the trial court's finding that that the test was improperly administered. Moreover, though Macias testified that appellee showed signs of intoxication in the HGN test, the trial court was within its discretion to disbelieve that testimony, *see id.*, and the videos do not show any clear signs of intoxication on the HGN test or otherwise. In particular, though Macias informed appellee at the scene that she was "swaying" while she took the HGN test, that is not apparent from the videos.

Finally, the record supports the trial court's determination that, though appellee refused to take a "portable breath test" or provide a breath specimen, this refusal occurred after she was effectively placed under arrest. In determining whether a police encounter is a detention or has escalated to a full-blown custodial arrest, courts consider:

> the amount of force displayed, the duration of a detention, the efficiency of the investigative process and whether it is conducted at the original location or the person is transported to another location, the officer's expressed intent—that is, whether he told the detained person that he was under arrest or was being detained only for a temporary investigation, and any other relevant factors.

*State v. Sheppard*, 271 S.W.3d 281, 291 (Tex. Crim. App. 2008); *see Dowthitt v. State*, 931 S.W.2d 244, 255 (Tex. Crim. App. 1996). At the time appellee refused to take a "portable breath test," she had already undergone the HGN test, and Macias had already repeatedly told her that there was an odor of alcohol and that he believed she was intoxicated. Therefore, the encounter had already escalated to an arrest at that point. *See*

*State v. Saenz*, 411 S.W.3d 488, 496 (Tex. Crim. App. 2013) (providing that a police encounter may constitute a full custodial arrest when there is probable cause to arrest, the arresting officer's knowledge of probable cause is "manifested to the suspect," and police do not tell the suspect she is free to leave); *Dowthitt*, 931 S.W.2d at 255. Accordingly, appellee's refusal to submit to a breath test is not properly considered in the probable cause analysis.

Excluding the odor of alcohol, the reading from the "passive alcohol sensor," the results of the HGN test, and appellee's refusal to submit a breath specimen, the facts and circumstances within Macias's knowledge at the time of appellee's arrest were as follows: (1) appellee committed the initial traffic violation; (2) appellee said at the scene that she had someone who could pick her up and take her home; (3) appellee called Trevino and asked him to talk to Macias on her behalf during the traffic stop; and (4) appellee declined to take the walk-and-turn test because she was "exhausted."

Reviewing the legal significance of these facts de novo, *see Baird*, 398 S.W.3d at 226, we cannot say that they amount to probable cause that appellant "did not hav[e] the normal use of mental or physical faculties by reason of the introduction of alcohol." *See* TEX. PENAL CODE ANN. § 49.01(2)(A). The videos show that, though appellee's lane change was unsafe, she was not driving recklessly or out of control. Moreover, the videos do not "indisputably contradict" the trial court's findings that appellee: "did not appear disheveled," "did not slur her speech," "spoke as a sober person," "did not trip or stumble," "moved and acted as a very cautious sober person," and "demonstrated signs of sobriety throughout her encounter" with Macias. Even though the trial court based those findings on its independent review of the video evidence rather than on any live testimony, we

defer to them. *See Montanez*, 195 S.W.3d at 108–09 (noting that "appellate courts should review a trial court's determination of historical facts under a deferential standard, even if that determination was not based on an evaluation of credibility and demeanor").[3] We conclude the trial court did not err in finding Macias had no probable cause to arrest.

### III. CONCLUSION

Because there was reasonable suspicion to support the initial traffic stop, we reverse the trial court's judgment insofar as it suppresses evidence of statements made by appellee before her arrest. The remainder of the trial court's judgment is affirmed, and we remand for further proceedings consistent with this opinion.

DORI CONTRERAS
Chief Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
22nd day of October, 2020.

---

[3] The United States Supreme Court has observed:

> The rationale for deference to the original finder of fact is not limited to the superiority of the trial judge's position to make determinations of credibility. The trial judge's major role is the determination of fact, and with experience in fulfilling that role comes expertise. Duplication of the trial judge's efforts in the court of appeals would very likely contribute only negligibly to the accuracy of fact determination at a huge cost in diversion of judicial resources. In addition, the parties to a case on appeal have already been forced to concentrate their energies and resources on persuading the trial judge that their account of the facts is the correct one; requiring them to persuade three more judges at the appellate level is requiring too much.

*Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 574–75 (1985); *see Carter v. State*, 309 S.W.3d 31, 40 n.47 (Tex. Crim. App. 2010).